**CREDIT UNION NATIONAL ASSOCIATION, INC., and Navy Federal Credit Union, Plaintiffs-Appellants,**

v.

**AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, INC., Defendant-Appellee.**

**No. 87–1429.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 2, 1987.

Decided Oct. 26, 1987.

---

Daniel W. Hildebrand, Ross & Stevens, S.C., Madison, Wis., for plaintiffs-appellants.

Louis A. Craco, Willkie Farr & Gallagher, New York City, for defendant-appellee.

Before BAUER, Chief Judge, and FLAUM and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

The American Institute of Certified Public Accountants (AICPA) recommends standards for the profession. People who depend on accountants' reports expect accountants to abide by the standards of the profession. One standard (Rule 203 of the AICPA Code of Professional Ethics) requires accountants to render financial reports in accord with decisions of the Financial Accounting Standards Board (the final arbiter of "generally accepted accounting principles" or GAAP), the Accounting Principles Board, and accounting research bulletins. To help accountants prepare reports in the absence of formal statements of GAAP, the AICPA issues reports stating its views of "generally accepted auditing standards" or GAAS. These standards are not enforceable directly under Rule 203, but preparation of a report claiming to conform to GAAS while departing from them might be fraud, and a report that does not claim to conform to GAAS may be unacceptable to clients and investors. The SEC requires financial reports on widely held or publicly traded corporations to conform to GAAS. See *United States v. Arthur Young & Co.*, 465 U.S. 805, 811 n. 6, 819 n. 14, 104 S.Ct. 1495, 1504, 79 L.Ed.2d 826 (1984).

For several years a committee of the AICPA considered a series of accounting issues that affect credit unions. After receiving the approval of the Financial Accounting Standards Board, the AICPA published *Audits of Credit Unions* (the Guide) in late 1986. This "Audit and Accounting Guide" establishes GAAS for audits of credit unions. It is not binding in the sense that departures will be met by legal sanctions, but "AICPA members may have to justify departures from the recommendations in this guide if their work is challenged." Guide at iii. The Guide describes the most common justification for departure: regulatory requirements. "If variances from generally accepted accounting principles are material in amount, the auditor should qualify his opinion or give an adverse opinion. The auditor's report should refer to the variance specifically and should give a clear explanation of the nature of the modifications and the effect of the variance". *Id.* at 16. See also *Arthur Young*, 465 U.S. at 818 n. 13, 104 S.Ct. at 1503 n. 13.

Accountants report deposits in commercial banks, mutual banks, and savings associations as "liabilities". Credit unions issue "shares" to their members, and the shares (on which "dividends" are paid) represent sums on deposit. The AICPA decided that deposits in credit unions likewise should be called liabilities, no matter how denominated between the credit union and the member-investor. Guide at 53–54. The Credit Union National Association and one credit union filed this suit claiming that the characterization of share accounts as "liabilities" is incorrect and causes injury to credit unions. The district court dismissed most of the complaint for want of a

case or controversy under Article III of the Constitution and granted judgment on the pleadings to the AICPA on the remaining claim. The court thought that the plaintiffs' claim of injury depended on too many speculative steps.

The plaintiffs reason that to avoid professional disgrace, accountants will choose to follow the Guide. The Guide gives two options: report share deposits as liabilities, or explain why not (Guide at 16). The explanation amounts to a "qualified opinion", which the plaintiffs say will injure their reputations and businesses. If credit unions allow their auditors to treat the share deposits as liabilities to get a clean report, however, the plaintiffs insist they will be misrepresenting the "true" nature of share deposits. Indeed, the plaintiffs believe that the National Credit Union Administration (NCUA), the federal agency with authority over credit unions, requires them to treat share deposits as equity rather than debt. So if accountants report share deposits as debt, the plaintiffs insist, they will be issuing unlawful reports of their financial condition—reports that, according to plaintiffs, also will injure their access to financial markets by "misrepresenting" their debt-equity ratio. And if accountants report share deposits as equity to avoid these unhappy consequences, the "qualified opinion" will engender unhappy consequences of its own, such as the unwillingness of (unsophisticated) persons to entrust money to credit unions.

One can get off this train at many stops. For example, the district court was not impressed by the claim that the NCUA's rules require reports to treat shares as equity rather than debt. A model form treats shares as equity, but the district court thought the model just one possible treatment among many. See 47 Fed.Reg. 23685 (June 1, 1982) (a decision by the NCUA to "deregulate the accounting manual" so that credit unions need not follow a single pattern). Another example: the proposition that listing shares as liabilities, thereby increasing the debt-equity ratio, will lead to higher rates of interest when credit unions borrow money, assumes that lenders are fooled by changes in accounting even though all the real factors are unaffected. A substantial body of data suggests that investors look to real variables rather than their accounting presentation. E.g., R.J. Ball, *Changes in Accounting Technique and Stock Prices*, 10 J. Accounting Research 1 (Supp.1972); Linda Elizabeth DeAngelo, *Accounting Numbers as Market Valuation Substitutes*, 61 Accounting Rev. 400 (1986); Richard W. Leftwich, *Accounting Information in Private Markets: Evidence from Private Lending Agreements*, 58 Accounting Rev. 23 (1983); Shyam Sunder, *Stock Price and Risk Related to Accounting Changes in Inventory Valuation*, 50 Accounting Rev. 305 (1975). See generally Ross L. Watts & Jerold L. Zimmerman, *Positive Accounting Theory* (1986). Credit unions typically borrow money from banks and other institutional lenders. These prosper by evaluating credit risks accurately; they are sophisticated and can see the change in debt-equity ratio produced by accounting for shares as debt does not affect the credit union's creditworthiness. The plaintiffs have not offered any evidence that the markets in which banks lend to credit unions would react adversely to a change in accounting treatment unaccompanied by any change in credit unions' real obligations. If even a few lenders recognize that credit unions are as likely to repay as they ever were, credit unions can borrow from them at the same rates as before; competition to supply money induces lenders to recognize the real risks they are taking rather than to stop with the first glance at the balance sheet.

Our principal concern, however, is not the weakness of any one link in plaintiffs' causal chain, but its length. See, e.g., *Allen v. Wright*, 468 U.S. 737, 756–61, 104 S.Ct. 3315, 3327–30, 82 L.Ed.2d 556 (1984); *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Haitian Refugee Center v. Gracey*, 809 F.2d 794, 801–07 (D.C.Cir.1987). See also *Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1341–1342 (7th Cir.1987) (collecting cases).

There are so many links, each problematic, that it is impossible to trace concrete injury to the AICPA's decision to classify shares as "liabilities" in the Guide. We do not know whether accountants will treat shares as liabilities or instead choose to treat them as equity and explain why; we do not know whether either treatment as liabilities or explanations for departures will produce adverse consequences for credit unions and, if so, what the causes of those consequences may be. The plaintiffs want us to resolve a dispute—what is the "right" accounting treatment of shares—without any clear understanding of the consequences either way or any clear link between choice and consequence.

Although the speculative quality of the causal chain makes this case inappropriate for judicial resolution, the dispute also illustrates the role of the case or controversy requirement in maintaining the separation of functions within the government. See *Allen*, 468 U.S. at 759–61, 104 S.Ct. at 3328–29; *Haitian Refugee Center*, 809 F.2d at 803–06; Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U.L.Rev. 881 (1983). Plaintiffs surely have legal remedies if accountants insist on misrepresenting the nature of share deposits. The fundamental question is who should supply that remedy. The NCUA may prescribe accounting conventions for credit unions, as the ICC has done in great detail for railroads. The AICPA conceded at oral argument that the NCUA's prescriptions would prevail over the Guide, to the extent of conflict. (We see none, in light of the Guide's permission for accountants to follow any regulatory requirements. The Guide lists "[r]egulatory requirements to classify savings (shares) as equity" as a "common variance[ ]" from GAAS. Guide at 16.)

If the AICPA errs in not understanding the peculiar legal and practical requirements of the credit union business, then the NCUA is the body best suited to supply a remedy. The NCUA can prescribe any accounting rules necessary to bring the industry into compliance with law; it also may establish policy when statutory law is silent. Perhaps the plaintiffs fear that the NCUA would side with the AICPA in this conflict, but this is hardly a reason why the industry should be allowed to bypass the agency. Cf. *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 302–06, 93 S.Ct. 573, 580–84, 34 L.Ed.2d 525 (1972); *Hansen v. Norfolk & Western Ry.*, 689 F.2d 707, 713 (7th Cir.1982). The questions at the core of this case deal with sound policy, not with legal entitlements.

The district court resolved on the merits the plaintiffs' claim that the Guide misrepresents the status of share deposits, in violation of the common law of Wisconsin. The court thought the Guide privileged as opinion. See *Whipp v. Iverson*, 43 Wis.2d 166, 168 N.W.2d 201 (1969). We believe this claim, too, should have been dismissed. The Guide is not a statement to investors; only the auditors make such statements, and as we have stressed we do not know what auditors will do and with what consequences. Actions for defamation must await the resolution of such intermediate steps. (Whether individual accountants have an action against the AICPA for putting them to a choice between the Guide and the client's wishes is a question we need not confront.)

The Guide is not communicated to investors in credit unions; it is a *definition* of GAAS addressed to accountants. Accountants may use it or explain why they have adopted an alternative treatment. The Guide does not say that share deposits "are" liabilities, as if words had meanings bestowed by natural law. The Guide states an axiom rather than a conclusion. It simply makes financial reports more consistent, and thus easier to understand. See Edmund W. Kitch, *Book Review*, 47 U.Chi. L.Rev. 394, 400–02 (1980). Readers may assume that financial reports issued without an explanation follow a convention; a person who chooses to use terms differently must explain what he is talking about, so as not to fool the reader. Some treatments may be preferable in the sense that they are congruent with the handling of other subjects (such as mutual savings banks); a more widely used meaning holds fewer sur-

prises for readers and requires fewer footnotes redefining terms. But a language for use in presenting financial statements is neither fact nor opinion. The Credit Union National Association might as well sue Oxford University for defining "debt" the same way the AICPA does—as "[t]hat which is owed or due; anything ... which one person is under obligation to pay or render to another". 3 *Oxford English Dictionary* 82 (1933).

Credit unions must redeem their share deposits, as banks must repay depositors; in this sense shares are liabilities; business corporations' shares are not similarly convertible into cash on demand. Depositors at credit unions vote, but not in proportion to their holdings. 12 U.S.C. § 1760. Doubtless shares are "equity" for some purposes, see § 703 of the Competitive Equality Banking Act of 1987, 101 Stat. 552 (1987), amending 12 U.S.C. § 1757(6). The right to vote, the contingency of dividends, and the right to participate in profits on liquidation are equity-like features. Arguments may be made for or against any particular classification of such a hybrid instrument. The NCUA may prescribe a treatment. The judicial branch of government should stand clear of definitional disputes. None of the claims presented in this case states a case or controversy under Article III of the Constitution.

The judgment is affirmed to the extent it dismisses the complaint for lack of standing. To the extent the district court resolved the merits, the judgment is vacated. The case is remanded with instructions to dismiss the entire suit for lack of a case or controversy. Appellee shall recover its costs.