Glen VOSGERICHIAN, on behalf
of himself and all others
similarly situated

v.

COMMODORE INTERNATIONAL, Irving
Gould, Medhi R. Ali, Ronald B. Alexander and Arthur Andersen & Co.

Civ. A. No. 92–4867.

United States District Court,
E.D. Pennsylvania.

Aug. 26, 1993.

John F. Innelli and Michael J. Molder, Philadelphia, PA, for plaintiff.

Bennett G. Picker, Ellen Rosen Rogoff, Philadelphia, PA, and Fredric W. Yerman, Phillip A. Geraci, and Andrew J. Melnick, New York City, for Commodore, defendants.

Arthur Makadon, Mark S. Stewart and Laurie Martin, Philadelphia, PA, for Arthur Andersen & Co.

### MEMORANDUM AND ORDER

DITTER, District Judge.

This is a securities fraud suit against Commodore International Limited, three of its senior officers (with Commodore, "the Commodore defendants,") and Commodore's independent auditor, Arthur Andersen & Co. In two amended complaints, plaintiff charges all defendants with violating the Securities Exchange Act of 1934, sections 10(b) and

20(a), as amended by 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b–5, promulgated by the Securities and Exchange Commission, 17 C.F.R. § 249.10b–5. Plaintiff also charges the Commodore defendants with negligent misrepresentation under Pennsylvania law.

Defendants move separately to dismiss plaintiff's complaints for failure to state a claim and failure to plead fraud with particularity. The Commodore defendants have attached a large appendix to their motion comprising all press releases, financial statements, and reports to which plaintiff had referred in his complaints. Since plaintiff has also had a reasonable opportunity to present pertinent material, I must treat defendants' motions as motions for summary judgment. *See* Federal Rule of Civil Procedure 12(b).[1]

I will grant Andersen's motion for summary judgment. I will also grant the Commodore defendants' motion, except as it concerns their failure to disclose a warrant repurchase agreement they allegedly entered into with Prudential Insurance in 1987. On that issue, I will deny summary judgment and permit the parties 60 days for discovery.

## I. *Facts*

The undisputed facts are as follows. Commodore is an American manufacturer of personal computers and other high technology products. It does most of its business in Europe. Through the 1980's Commodore prospered, but in 1989 the company's sales began to fall off and net income decreased sharply, particularly in Europe. This was partly due to the fact that between December, 1989, and June, 1990, the growth rate of the European computer market dropped five percent.

In April, 1991, Commodore launched CDTV, a new interactive compact disc televi-

sion system for the home. CDTV sold slowly. Thereafter, Commodore's fortunes continued to decline.

Plaintiff charges that the Commodore defendants, with the help of their auditor, Andersen, intentionally misled shareholders about the company's financial health. As a result, plaintiff and the other shareholders who purchased Commodore stock between July 1, 1990, and August 19, 1992, were allegedly damaged as a result of having relied on defendants' misrepresentations. Plaintiff charges that these misrepresentations composed a "continuing course" of fraudulent conduct which was designed to inflate the price of Commodore stock artificially and attract a willing buyer.

### A. The GAAP Violations

#### 1. *The Litigation Settlement*

◼ The first element of defendants' alleged course of fraud involved Commodore's financial reporting practices. It is undisputed that in 1991, Commodore settled a lawsuit with its former president for $9.2 million. In its FY91 third-quarter financial statement, Commodore termed this settlement an "extraordinary item." Because generally accepted accounting principles ("GAAP") reserve the term "extraordinary item" for expenses *more* unusual than litigation, plaintiff charges that the Commodore defendants, with Andersen's acquiescence, knowingly violated GAAP. Moreover, Andersen, by issuing a "clean" or unqualified opinion for Commodore's statement, allegedly violated generally accepted auditing standards ("GAAS") as well.[2]

In addition, the Commodore defendants are charged with fraudulently using the term "extraordinary item" in two different ways. In the third-quarter of FY91, Commodore reported its net income as $10.6 million "be-

---

1. Although all the additional material was submitted by the Commodore defendants, it pertains to Andersen's motion as well so all defendants' motions may be treated as motions for summary judgment.

2. GAAS represents auditing standards approved and adopted by the membership of the American Institute of Certified Public Accountants (AICPA), AU § 150.02. Similarly, GAAP "encompasses

the convention, rules, and procedures necessary to define accepted accounting practice at a particular time," AICPA, AU § 411.02. In essence, GAAS and GAAP delineate due professional care owed by accountants to their clients as stated by the accounting community. *See The Official Committee of Unsecured Creditors of Corell Steel v. Fishbein & Co.*, No. 91–4919, 1992 WL 196768, at *5 (E.D.Pa. Aug. 10, 1992).

fore extraordinary item," making its income sound higher than the $1.4 million it actually was after payment of the settlement. The next year, however, in comparing its current income to the prior year's, Commodore called the FY91 third-quarter income "$1.4 million ... after extraordinary charge," which, plaintiff charges, was intended to make the actual drop in net income from FY91 to FY92 seem smaller. Commodore does not contest the fact that it reported its FY91 third-quarter income these two different ways.

### 2. *The Undisclosed Obligation to Prudential*

Second, with regard to Commodore's financial statements, Commodore does not dispute that it never disclosed an obligation, allegedly incurred in 1987, to buy back warrants for stock which it had conveyed to Prudential Insurance Company in 1987 in connection with a $60 million loan. Commodore maintains it never had such an obligation.

Moreover, Commodore concedes that in 1989 and 1991, when it did buy back portions of these warrants, it reported these re-purchases in its financial statements as equity transactions. Arthur Andersen does not dispute that it "advised or concurred" with Commodore's decision to do so.

### B. CDTV

Plaintiff's second charge in the Commodore defendants' "course" of fraudulent conduct is that these defendants misrepresented their expectations for the interactive video product, CDTV. Plaintiff charges these defendants with promising that the product would do far more than it did. What Commodore actually "promised" about CDTV is fully contained in the defendants' exhibits, however, and because plaintiff has not challenged these submissions as either inaccurate or incomplete, I consider these statements not in dispute.

In Commodore's first CDTV press release on April 3, 1991, it introduced its "revolutionary consumer electronics component." Commodore stated that, "During the introductory phase, 50 CDTV multimedia titles will be available, with more than a hundred planned." (Appendix, CDTV Press Release). Also in that release, Nolan Bushnell, general manager of Commodore's Interactive Consumer Products Division, stated:

> We believe the CDTV player and interactive multimedia will be to the 1990s what VCRs and videos were to the 1980s. The CDTV system will make our education entertaining and our entertainment educational. If we can change the world through information, then this is the product to do it.

Later that month, Commodore's chairman, Irving Gould, stated: "Commodore's range of products is now being enhanced with the launch of CDTV, an innovative multi-media product which represents a major potential opportunity in the consumer market." (Appendix, FY91 3Q PR and Report.)

At the end of that year, the company's 1991 annual report announced:

> [CDTV] was received with great enthusiasm by industry analysts and retailers. The Electronic Industries Association named it one of the most innovative consumer electronics products of 1991. *Popular Science* named CDTV one of 1990's "Best of What's New" products for the home.

It continued, "Commodore and other third party developers introduced more than 50 CDTV titles with 100 planned to be available by Christmas 1991," and concluded:

> Commodore plans to offer a wide range of CDTV accessory products in fiscal 1992, including keyboard, genlock, and storage and networking devices. In addition, Commodore plans to introduce a new video card that will substantially enhance the color capability of CDTV to over 4 million colors.

Finally, in its 1991 Financial Review, Commodore stated plainly that: "The CDTV, the first CD based interactive multimedia player for consumers, was launched in the fourth quarter of fiscal 1991 and accounted for only a nominal share of sales." (Appendix, 1991 Report.)

Commodore does not contest that CDTV sold slowly. In the spring of 1992, just after

the Christmas season, the company cut CDTV's suggested retail price by 20 percent.

## C. Reliance on the Shrinking European Market

The final element of Commodore's alleged fraud is its failure to disclose the extent of the European recession's impact on Commodore's growth in Europe. Commodore concedes it relied heavily on the European computer market. It also concedes that the demand for personal computers in Europe dropped sharply in 1990 and 1991. For his part, plaintiff concedes that the recession was widely recognized and that defendants had no duty to report on Europe's economy in greater detail. What was fraudulent, plaintiff charges, was Commodore's failure to disclose how this recession had actually affected growth, reporting instead that declining revenues were due to "currency fluctuations" and a "weak global economic environment." In particular, plaintiff charges that Commodore's reports of "continuing sales growth of European operations" and its "sustained growth ... despite the significant unfavorable effect of foreign exchange rates" were false. Plaintiff claims it is now evident that the company's high sales volume was due not to continued growth but to Commodore's aggressive price cutting strategy.

## II. *The Motions for Summary Judgment*

### A. Arthur Andersen & Co.

I will address Arthur Andersen's motion first. Plaintiff brought Andersen in as a defendant in its first amended complaint, charging negligent misrepresentation in connection with Commodore's primary fraud. Andersen moved to dismiss. In response, plaintiff submitted an "Amended Class Action Complaint as to Arthur Andersen & Co.," in which he dropped the negligent misrepresentation claim and charged the auditor

with securities fraud instead.[3] In the latest complaint, plaintiff charges that Andersen, "in concert with Commodore and the Individual Defendants, directly and indirectly, engaged and participated in or aided and abetted a continuous course of conduct and conspiracy to conceal adverse material information regarding the future prospects of Commodore." More specifically, plaintiff charges Andersen with "failing to disclose:

(a) that the settlement of the litigation did not satisfy the requirements of GAAP for treatment as an extraordinary item and that so characterizing the settlement served to inflate apparent earnings for FY91 and specifically the third quarter thereof; and

(b) that the company had undisclosed repurchase liabilities relating to a financing arrangement with Prudential and the accounting treatment applied to that transaction effectively hi[d] at least $9 million in additional interest paid to Prudential."[4]

█ Andersen is entitled to summary judgment. Securities fraud in violation of section 10(b) consists of: "(1) a false representation of (2) a material (3) fact, (4) the defendant's knowledge of its falsity and his intention that the plaintiff rely on it, (5) the plaintiff's reasonable reliance on the representation, and (6) the plaintiff's resulting loss." *Shapiro v. UJB*, 964 F.2d 272, 280 (3d Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992); *Lewis v. Chrysler Corp.*, 949 F.2d 644, 649 (3d Cir.1991).

No reasonable jury could find that either of Andersen's two alleged GAAP violations (regarding the settlement or the re-purchases), or Andersen's alleged advice on the equity treatment, constituted a false representation of material fact.

#### 1. *The Litigation Settlement*

█ Even assuming that calling a $9.2 million settlement "extraordinary" violates

---

3. Pursuant to Federal Rule of Civil Procedure 15(a), plaintiff needed either defendants' written consent or leave of court to file this additional amended complaint. As far as I know he did not receive Andersen's consent, and I know he never requested leave of court. Nonetheless, I will consider any objection to the second amended complaint waived, since Andersen has responded

orally and in writing to this complaint without raising the rule 15(a) issue.

4. The allegation that Andersen "advised or concurred with Commodore's decision to treat the re-purchases as equity transactions" in 1989 and 1991 is in the Factual Background section of the Andersen complaint. (*See* ¶ 19.)

GAAP, which seems unlikely,[5] I find that the characterization fails to state a *material* misrepresentation of fact for purposes of holding Andersen liable for securities fraud. Misrepresentations or omissions are only material if there is a substantial likelihood that a reasonable investor would have viewed accurate disclosure as "significantly alter[ing] the 'total mix' of information" available. *Craftmatic Securities Litigation v. Kraftsow*, 890 F.2d 628, 639 (3d Cir.1989), quoting *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Moreover,

> [I]f the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality ... it [is] appropriate for the district court to rule that the allegations are inactionable as a matter of law.

*Shapiro*, 964 F.2d at 280, n. 11 (citation omitted).

Having reviewed the financial statements in which Commodore (through Andersen) called the settlement "extraordinary," I find that this characterization was "so obviously unimportant" that no reasonable jury could consider it material. The financial statements clearly set forth Commodore's income and earnings both before and after the $9.2 million settlement. Any investor who read the third-quarter FY91 and FY92 financial statements closely enough to see the "extraordinary item" *also* saw that payment's rather profound effect on the company's net income, stated just below. (*See* Appendix, FY91 3Q PR and Report, FY92 3Q PR and Report.) No reasonable investor could have considered it significant what a settlement was *called* when it was always clear what the amount, the purpose, and the effect of that settlement were. *See Craftmatic*, 890 F.2d

at 639 (misrepresented or omitted information is only material if it would have assumed actual significance in a reasonable shareholder's deliberations); *see also Credit Union Nat. Ass'n, Inc. v. AICPA*, 832 F.2d 104, 106 (7th Cir.1987) (citing "substantial body of data" showing that investors look to real variables in making investment decisions, not accounting presentation).[6]

Andersen is entitled to summary judgment on the charge that its characterization of the litigation settlement as "extraordinary" violated the securities laws.

2. *The Warrants Issued to Prudential*

■ The same is true of the claim regarding Commodore's "undisclosed re-purchase liabilities relating to a financing arrangement with Prudential." As was made clear at oral argument, the essence of plaintiff's charge against Andersen is not that the accounting firm should have treated Commodore's alleged re-purchase obligation differently back in 1987,[7] but that in 1989 and 1991, when Commodore bought back portions of its warrants, Andersen should have refused to treat the re-purchases as equity transactions and should have instead identified them as the repayment of debt. (*See* Transcript of Oral Argument, April 29, 1993, at 72, 76–79.)

■ Again, however, I find that the treatment of the re-purchases on Commodore's balance sheet is immaterial for purposes of Andersen' alleged fraud. There is nothing to suggest that Andersen knew or had reason to know that Commodore's re-purchases of warrants from Prudential were anything other than equity transactions. Moreover, both transactions were fully disclosed in the company's financial statements and in its press releases. Any reasonable investor knew from reading any of those documents what warrants Commodore had issued, when it

---

5. It may be that while most litigation items are not "extraordinary," a settlement of $9.2 million with a former CEO is, indeed.

6. *See also Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422, 432 (6th Cir.1980), *cert. denied sub nom. Mary Lillian Adams v. Peat, Marwick, Mitchell & Co.*, 449 U.S. 1067, 101 S.Ct. 795, 66 L.Ed.2d 611 (1980). In that case, the Sixth Circuit panel held that even though the district court had correctly found violations of GAAP and

GAAS, it erred in entering judgment against the accountants because there was insufficient evidence of scienter and because the "financial statements [were not] *materially* at odds with the real facts" (emphasis in original).

7. Plaintiff does contend that Andersen should have assigned a value to the re-purchase obligation in 1987, but has not pressed that part of the claim presumably because it is time-barred.

bought them back, and at what price. Since no reasonable investor could have considered the *accounting treatment* of the purchases significant, Andersen is entitled to summary judgment.[8]

## B. The Commodore Defendants

I will also grant summary judgment for the Commodore defendants on all but one claim.

### 1. *The Litigation Settlement*

To the extent that the Commodore defendants are also charged with wrongfully calling the settlement with the company's former president "extraordinary," they, too, are entitled to summary judgment, under the same reasoning that the accounting characterization is immaterial.

■ To the extent the Commodore defendants are charged with manipulating that label—with stating in third-quarter FY91 that income was "$10.6 million ... before extraordinary item," but in third-quarter FY92 that earnings were "4.1 million.... compare[d] with net income of $1.4 million after extraordinary charge ... in the year-ago quarter"—the Commodore defendants are still entitled to summary judgment, and on the same ground. Again assuming that the charge should not have been called extraordinary, I still hold that no reasonable jury could find that investors would have thought it significant that Commodore described its income these two different ways. Whether a bottle is called half-full or half-empty would hardly be considered crucial by a prospective purchaser. Every material detail about the settlement was disclosed in Commodore's Statement of Operations, which was directly attached to the company's press release. Reasonable investors are charged with *reading* a company's reports before they rely on them, and no such investor could have mistaken what the "extraordinary" charge was or how it affected Commodore's financial health.

### 2. *The Secret Re–Purchase Agreement*

■ The alleged secret re-purchase obligation is a more difficult summary judgment issue. Part of the problem is the wording of plaintiff's allegation. It states that Commodore "was *either* obligated *or* intended to re-purchase the warrants" from Prudential (emphasis added). If Commodore only *intended* to buy back the warrants, it hardly acted fraudulently in failing to disclose this future, potential, business consideration. If, however, Commodore had obligated itself to re-purchase the warrants, but deliberately hid this obligation from its investors, there may be actionable fraud. This charge is sufficiently supported by the facts alleged in the amended complaint, and is not rebutted by any of defendants' documents. According to

---

8. As this issue originally arose on a motion to dismiss, I will also note that plaintiff fails to allege Andersen acted with scienter either in "failing to disclose" Commodore's re-purchase obligation or in treating the re-purchases as equity. In its motion, Andersen urges a stricter pleading standard for securities fraud claims against accountants. It cites *In re Healthcare Services Group, Inc. Securities Litigation,* No. 91–6097, 1993 WL 54437 (E.D.Pa. March 1, 1993), which held that a securities fraud complaint against an accountant must allege specific facts in support of the firm's "malice or evil intent" toward shareholders. I think, however, that even under the ordinary scienter standard, plaintiff fails to allege that Andersen *intended* Commodore's shareholders to rely on its accounting decisions.

The Andersen complaint charges that Andersen "advised or concurred" with Commodore's decisions and thereby violated GAAP and GAAS, but clearly, even deliberate violations of those guidelines, without more, do not amount to fraud. *See*

*Quest Medical, Inc. v. Kirschner Medical Corp.,* Nos. WN–90–858, WN–90–240, 1992 WL 311193, at *3–4 (D.Md. July 29, 1992) (dismissing complaint against outside auditor despite alleged violations of GAAP and GAAS, because plaintiff failed to allege facts in support of recklessness or intent to deceive); *Ades v. Deloitte & Touche,* Nos. 90 Civ. 4959, 90 Civ. 5056, 1992 WL 6142, at *3 (S.D.N.Y. Jan. 3, 1992) (dismissing complaint against auditor under rule 9(b) because plaintiff merely catalogued GAAS and GAAP violations without alleging supporting facts); *SEC v. Price Waterhouse,* 797 F.Supp. 1217, 1240 (S.D.N.Y.1992) (holding that to charge an accountant with reckless violations of the securities laws, the SEC must allege more than a misapplication of accounting principles; it must prove the accounting practices were so deficient that the audit amounted to no audit at all, or to an egregious refusal to see the obvious, or that the accounting judgments made were such that no reasonable accountant would have made the same decisions if confronted with the same facts).

plaintiff, Commodore bought back one-third of the warrants it had transferred at six dollars apiece on March 14, 1989, almost one third of the way through the life of the senior notes. On May 9, 1991, almost two-thirds of the way through the life of those notes, Commodore re-purchased precisely the same number of warrants at precisely the same price. The loan from Prudential was arranged, according to plaintiff, by Medhi R. Ali, who is the current president of Commodore but who worked for Prudential in 1987. Plaintiff claims that the timing of the re-purchases made no sense from either party's perspective, and that therefore the re-purchases must have been the result of a prior, undisclosed agreement between Commodore and Prudential.

This issue may proceed. I will permit a 60–day period of discovery only on the allegation of Commodore's undisclosed obligation to buy back warrants from Prudential. After 60 days, the parties may submit whatever motions they think appropriate.

### 3. *CDTV*

■ With respect to the Commodore defendants' representations about CDTV, summary judgment is appropriate. Despite plaintiff's re-characterizations and, indeed, mischaracterizations of Commodore's promises about CDTV, it is clear from the press releases themselves, recited above, that Commodore said nothing which reasonable jurors could find was both misleading and material. There is therefore no genuine issue precluding judgment for the Commodore defendants.

All of Commodore's statements about CDTV either constitute unactionable "puffing" (CDTV is "revolutionary," it can "change the world," could "be what VCR's . . . were to the 1980's")[9], or they are not misleading. Commodore promised only that it would have 50 titles "in [its] introductory phase," not that it would have them immediately.[10] Mr. Gould announced that CDTV represented a "major potential opportunity"—which could only be taken as a doubly qualified advertisement, not any kind of promise at all. The analysts' "great enthusiasm" for CDTV was accompanied by the company's precise bases for so reporting. Finally, Commodore·said clearly that early CDTV sales were only "nominal."

Plaintiff points to the subsequent admission of Commodore's chief financial officer, defendant Ronald B. Alexander, that Commodore "never expected [CDTV] to be an instant success," as evidence of the company's duplicity. Mr. Alexander's statement, however, is wholly consistent with Commodore's other, earlier representations that CDTV's success would be gradual.

That the complaint only charges Commodore with "hinting that CDTV . . . would pave the way for the company's future growth" suggests the plaintiff's larger inability to allege, at least in compliance with Rule 11, that Commodore actually misstated or misrepresented anything material. Summary judgment for defendants is appropriate.[11]

### 4. *Reliance on the European Market*

■ Finally, the Commodore defendants are also entitled to summary judgment on the claim that they falsely portrayed Commodore's continued growth in a shrinking European market. The thrust of plaintiff's allegation, narrowed now through two complaints, several memoranda, and one oral argument,

---

**9.** *See Hoxworth v. Blinder, Robinson & Co., Inc.,* 903 F.2d 186, 200–01 (3d Cir.1990).

**10.** That it said in its 1991 report that it and other third party developers had "introduced more than 50 CDTV titles," whereas plaintiff claims it had only 30 is also not material. The difference of 20 titles to a reasonable investor considering a new and "revolutionary" product is not substantially likely to have assumed actual significance. *See TSC Industries,* 426 U.S. at 449, 96 S.Ct. at 2132; *Craftmatic,* 890 F.2d at 639.

**11.** Indeed, some of the misrepresentations with which plaintiff charges Commodore were simply never made. For example, plaintiff claims Commodore "led investors to believe.... CDTV would be the point of an arrow leading Commodore into the U.S. market," (Amended Complaint ¶ 56), and that Commodore failed to disclose "that the Company's product development and marketing programs could not offset erosion of the European market," (*id.* ¶ 68(c)). These are plaintiff's characterizations, not the defendants' claims. Plaintiff does not point to, and I do not find, those claims anywhere in defendants' lengthy exhibits.

is that without telling its shareholders, Commodore drastically reduced its computer prices in Europe so as to continue to report high sales volume *despite* the European recession. As the Commodore defendants have pointed out, however, there is no actionable fraud in failing to report a price decrease (assuming that is what happened), because Commodore accurately reported both its large drop in earnings and its much smaller drop in sales. Anyone with an elementary mathematics education could determine that Commodore's sale price dropped proportionately.

■ When the undisclosed elements of a company's financial situation are obvious from that which the company *does* disclose, the company cannot be held liable for a material omission. As Judge McGlynn held in *In re Bell Atlantic Securities Litigation,* No. 91–0514, 1991 WL 234236 (E.D.Pa. Oct. 30, 1991):

> Simple calculations show expenses were increasing at a higher percentage rate than operating revenues from the second to the third quarters. Although the average investor may not take the time to do the calculations, the information was available from which he could conclude on his own that expense growth was "outstripping" revenue growth.

*Id.* at *5. All pertinent information was similarly available here. No reasonable juror could find that the Commodore defendants defrauded stockholders about the company's growth in Europe.

### III. *Conclusion*

Plaintiff's argument relies on the theory that the whole of Commodore's alleged fraud is greater than the sum of its parts. Cumulatively, plaintiff contends, Commodore's small, individual "misrepresentations" in its financial reports and press releases amounted to one larger, intentional scheme to conceal the company's failing financial health.

I disagree. With the one exception discussed, none of the alleged misrepresentations even presents a genuine issue of fact about fraud on the part of Commodore (much less Andersen). Plaintiff fails to rebut defendants' strong documentary evidence that there was no actionable fraud in Commodore's financial statements, in its predictions for CDTV, or in its reports about its growth in the European market. Consequently, even taken together, these allegations do not amount to fraud.

Only with respect to Commodore's alleged undisclosed obligation to re-purchase stock warrants from Prudential is there an issue of potential fraud. This question alone, as against the Commodore defendants alone, may proceed to discovery.

Plaintiff's state claim of negligent misrepresentation against the Commodore defendants may also therefore survive, at least through the 60–day discovery period. An order follows.

### ORDER

AND NOW, this 26th day of August, 1993, it is hereby ordered that:

1. Defendants' motions to dismiss are converted to motions for summary judgment pursuant to Federal Rule of Civil Procedure 12(b).

2. Summary judgment is entered for defendant, Arthur Andersen & Co.

3. Summary judgment is entered for defendants, Commodore International Limited, Irving Gould, Medhi R. Ali, and Ronald B. Alexander, except insofar as they are alleged to have failed to disclose an obligation to re-purchase warrants from the Prudential Insurance Company.

4. With respect to that remaining claim, all discovery shall be completed on or before Monday, October 25, 1993.