**Glen VOSGERICHIAN, on behalf of himself and all others similarly situated,**

v.

**COMMODORE INTERNATIONAL, Irving Gould, Medhi R. Ali, Ronald B. Alexander and Arthur Andersen & Co.**

Civ. A. No. 92–4867.

United States District Court, E.D. Pennsylvania.

Sept. 21, 1994.

**1372**

John F. Innelli, Michael J. Molder, Philadelphia, PA, for plaintiff.

Bennett G. Picker, Ellen Rosen Rogoff, Philadelphia, PA, Fredric W. Yerman, Phillip A. Geraci, Andrew J. Melnick, New York City, for Commodore defendants.

Arthur Makadon, Mark S. Stewart, Laurie Martin, Philadelphia, PA, for Arthur Andersen & Co.

## MEMORANDUM

DITTER, District Judge.

In this case, plaintiff alleged that defendants violated sections .10(b) and 20(a) of the

Securities and Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a) (1981), and Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5 (1988). Commodore International along with the individual defendants (together, "the Commodore defendants") and Arthur Andersen & Co. ("AA") each filed a motion to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). The Commodore defendants submitted an appendix of exhibits with their motion.

I concluded that because the Commodore defendants had submitted material extraneous to the pleadings and because plaintiff had had "a reasonable opportunity to present pertinent material" himself, defendants' motions should be treated as motions for summary judgment.[1] I entered summary judgment in favor of AA and partial summary judgment in favor of the Commodore defendants. I did not, however, give plaintiff prior notice of my intention to treat the motions to dismiss as motions for summary judgment, 832 F.Supp. 909.

Plaintiff filed a motion for reconsideration, arguing that I erred in converting defendants' motions to dismiss into motions for summary judgment without providing plaintiff the requisite notice and opportunity for discovery. Plaintiff asks that I vacate my prior order and deny defendants' motions to dismiss.

**FACTS.**

Commodore manufactured personal computers and other high technology products. Through the 1980s Commodore prospered, but in 1989, the company's sales began to fall off and net income decreased sharply, particularly in Europe. Plaintiff charges that the Commodore defendants, with the help of their auditor, Andersen, intentionally misled shareholders about the company's financial health. Plaintiff and the other shareholders who purchased Commodore stock between July 1, 1990, and August 19, 1992, were allegedly damaged as a result of having relied on defendants' misrepresentations. Plaintiff specifically alleges the following:

## A. THE GAAP VIOLATIONS

### 1. The Litigation Settlement

The first element of defendants' alleged course of fraud involved Commodore's financial reporting practices. In 1991, Commodore settled a lawsuit with its former president for $9.2 million. In its FY91 third-quarter financial statement, Commodore termed this settlement an "extraordinary item." Because generally accepted accounting principles ("GAAP") reserve the term "extraordinary item" for expenses *more* unusual than litigation, plaintiff charges that the Commodore defendants, with Andersen's acquiescence, knowingly violated GAAP. Moreover, Andersen, by issuing a "clean" or unqualified opinion for Commodore's statement, allegedly violated generally accepted auditing standards ("GAAS") as well.[2]

In addition, the Commodore defendants are charged with fraud due to their use of the "extraordinary item" in two different ways. In the third-quarter of FY91, Commodore reported its net income as $10.6 million "before extraordinary item," making its income seem higher than the $1.4 million it actually was after payment of the settlement. The next year, however, in comparing its current income to the prior year's, Commodore called the FY91 third-quarter income "$1.4 million ... after extraordinary charge," which, plaintiff contends, was intended to make the actual drop in net income from FY91 to FY92 seem smaller.

### 2. The Undisclosed Obligation to Prudential

Second, plaintiff alleges that Commodore failed to disclose in its financial statements

---

1. I also determined that the appendix contained material relevant to AA's motion to dismiss and converted it as well.

2. GAAS represents auditing standards approved and adopted by the membership of the American Institute of Certified Public Accountants (AICPA), AU § 150.02. Similarly, GAAP "encompasses the convention, rules, and procedures necessary to define accepted accounting practice at a particular time," AICPA, AU § 411.02. In essence, GAAS and GAAP delineate due professional care owed by accountants to their clients as stated by the accounting community. *See The Official Committee of Unsecured Creditors of Corell Steel v. Fishbein & Co.*, No. 91–4919, 1992 WL 196768, at *5 (E.D.Pa. Aug. 10, 1992).

an obligation, allegedly incurred in 1987, to buy back warrants for stock it had conveyed to Prudential Insurance Company in 1987, in connection with a $60 million loan. Commodore does not dispute that this obligation was never disclosed; rather, it maintains it never had such an obligation.

Moreover, Commodore concedes that in 1989, and 1991, when it did buy back portions of these warrants, it reported these re-purchases in its financial statements as equity transactions. Arthur Andersen does not dispute that it "advised or concurred" with Commodore's decision to do so.

### B. CDTV

Plaintiff's second charge in the Commodore defendants' course of fraudulent conduct is that these defendants misrepresented their expectations for CDTV, a new interactive compact disc television system for the home. Plaintiff charges that defendants promised that the product would do far more than it did.

In Commodore's first CDTV press release on April 3, 1991, it introduced its "revolutionary consumer electronics component." Commodore stated that, "During the introductory phase, 50 CDTV multimedia titles will be available, with more than a hundred planned." (Appendix, CDTV Press Release). Also in that release, Nolan Bushnell, general manager of Commodore's Interactive Consumer Products Division, stated:

> We believe the CDTV player and interactive multimedia will be to the 1990s what VCRs and videos were to the 1980s. The CDTV system will make our education entertaining and our entertainment educational. If we can change the world through information, then this is the product to do it.

Later that month, Commodore's chairman, Irving Gould, stated: "Commodore's range of products is now being enhanced with the launch of CDTV, an innovative multi-media product which represents a major potential opportunity in the consumer market." (Appendix, FY91 3Q PR and Report.)

At the end of that year, the company's 1991 annual report announced:

[CDTV] was received with great enthusiasm by industry analysts and retailers. The Electronic Industries Association named it one of the most innovative consumer electronics products of 1991. *Popular Science* named CDTV one of 1990's "Best of What's New" products for the home.

It continued, "Commodore and other third party developers introduced more than 50 CDTV titles with 100 planned to be available by Christmas 1991," and concluded:

> Commodore plans to offer a wide range of CDTV accessory products in fiscal 1992, including keyboard, genlock, and storage and networking devices. In addition, Commodore plans to introduce a new video card that will substantially enhance the color capability of CDTV to over 4 million colors.

Finally, in its 1991 Financial Review, Commodore stated plainly that: "The CDTV, the first CD based interactive multimedia player for consumers, was launched in the fourth quarter of fiscal 1991 and accounted for only a nominal share of sales." (Appendix, 1991 Report.)

Commodore does not contest that CDTV sold slowly. In the spring of 1992, just after the Christmas season, the company cut CDTV's suggested retail price by 20 percent.

### C. RELIANCE ON THE SHRINKING EUROPEAN MARKET

The final element of Commodore's alleged fraud is its failure to disclose the extent of the European recession's impact on Commodore's growth in Europe. Commodore concedes it relied heavily on the European computer market. It also concedes that the demand for personal computers in Europe dropped sharply in 1990 and 1991. Plaintiff concedes that the recession was widely recognized and that defendants had no duty to report on Europe's economy in greater detail. What was fraudulent, plaintiff charges, was Commodore's failure to disclose how this recession had actually affected growth, reporting instead that declining revenues were due to "currency fluctuations" and a "weak global economic environment." In particular, plaintiff charges that Commodore's re-

ports of "continuing sales growth of European operations" and its "sustained growth . . . despite the significant unfavorable effect of foreign exchange rates" were false. Plaintiff claims it is now evident that the company's high sales volume was due not to continued growth but to Commodore's aggressive price cutting strategy.

## DISCUSSION.

### A. THE CONVERSION OF MOTIONS TO DISMISS INTO MOTIONS FOR SUMMARY JUDGMENT WAS ERRONEOUS.

■ The Third Circuit has specifically held that "litigants are entitled to 10 days notice before a Rule 12(b)(6) motion to dismiss may be converted into a Rule 56 motion for summary judgment." *Crown Central Petroleum v. Waldman*, 634 F.2d 127, 129 (3d Cir.1980). I did not give plaintiff any notice that I intended to rule on defendants' motions to dismiss as motions for summary judgment; therefore, the conversion was improper.

### B. PLAINTIFF'S CLAIMS MUST NONETHELESS BE DISMISSED.

### 1. Consideration of the documents in the appendix was proper in ruling on a motion to dismiss.

■ Generally, in ruling on a motion to dismiss, a court "may not consider any material other than the pleadings." 2A James W. Moore et al., Moore's Federal Practice ¶ 12.07[2.–5], at 12–89 (2d ed. 1994). If the court does consider extraneous material, Rule 12(b) requires that the motion to dismiss be converted into a motion for summary judgment and that all parties be given a "reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed.R.Civ.Pro. 12(b).

■ "[M]aterial which is submitted as part of the complaint, as well as certain items in the record and the public record," however, may be consulted in deciding a motion to dismiss without treating the motion as one for summary judgment. *Pension Benefit Guaranty Corp. v. White Consolidated Industries*, 998 F.2d 1192, 1196 (3d Cir.1993); 2A James W. Moore et al., Moore's Federal Practice ¶ 12.07[2.–5] at 12–90 to 12–91; *see also* 5A Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 1357, at 299 (1990) ("In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account.").

■ The Third Circuit has held that consideration of "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss" does not require that the motion to dismiss be converted into a motion for summary judgment "if the plaintiff's claims are based on the document." *Pension Benefit*, 998 F.2d at 1196; *see also In re Donald Trump Casino Securities Litigation—Taj Mahal Litigation*, 7 F.3d 357, 368 n. 9 (3d Cir.1993). The reasoning underlying this rule is obvious:

> Were courts to refrain from considering such documents, complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure. Foreclosing resort to such documents might lead to complaints filed solely to extract nuisance settlements.

*Kramer v. Time Warner Inc.*, 937 F.2d 767, 774; *see also Goodwin v. Elkins & Co.*, 730 F.2d 99, 113 (3d Cir.1984) (Becker, J., concurring) (counseling that "where a document is actually and necessarily relied upon in the allegations of a complaint, and its authenticity is conceded, the document may be considered by the court" on a motion to dismiss; otherwise, plaintiff's claims could survive "where the terms of the document on which the claim is based would render the complaint insufficient as a matter of law simply by refusing to attach the document to the complaint").

Because plaintiff has never contested the authenticity of the documents in the appen-

dix, I conclude that all of the exhibits are "undisputedly authentic." [3] Thus, the issue becomes whether plaintiff's claims are based on each of the documents.

Plaintiff concedes that I may properly take into "account the *full text* of the statements set forth in the complaint in determining what message was sent to the investment community." [4] (emphasis added). Plaintiff actually paraphrased and/or quoted from all but two of the exhibits that the Commodore defendants attached.[5] These exhibits are necessarily documents on which plaintiff bases his claims. Thus, each of these exhibits can properly be considered in deciding the motions to dismiss.

The only other documents which were submitted as part of the appendix are the 1990 annual report and FY93 1Q press release.[6] While plaintiff does not quote from the FY93 1Q press release, he does quote the financial information contained in the report accompanying the release. Therefore, in an abundance of caution, I will only consider the financial data and not the press release. Likewise, I will not consider the 1990 annual report.

**2. Because the judgments in favor of defendants were based on plaintiff's failure as a matter of law to state essential elements of his fraud case, the claims must now be dismissed.**

### a. Arthur Andersen & Co.

■ In granting summary judgment in favor of AA, I held that no reasonable investor would have considered either of the misrepresentations which plaintiff alleged to be *material.* First, with respect to the characterization of the litigation settlement as an "extraordinary item" in violation of GAAP, I found that all relevant information about the settlement had been disclosed to investors in the same documents. "Any investor who read the third-quarter FY91 and FY92 financial statements closely enough to see the 'extraordinary item' *also* saw that payment's rather profound effect on the company's net income, stated just below." The financial statements reflected the "amount, the purpose, and the effect" of the settlement, none of which plaintiff contends was inaccurate. Thus, I concluded that no reasonable investor could have found any *mislabeling* of the settlement agreement to be a material misrepresentation because it did not "significantly

---

**3.** Plaintiff had ample opportunity to object to the documents on the grounds of authenticity. At oral argument, Mr. Yerman, counsel for the Commodore defendants, specifically pointed out that he had attached various documents to the motion to dismiss and requested that I examine them closely. (*See* Transcript of Oral Argument, April 8, 1993, at 6, lines 17–20; at 14, lines 22–24; at 40, lines 8–9; at 46, lines 9–10; at 56, lines 23–24; at 57, lines 1–19). At no time did plaintiff raise any objection to the utilization of the documents in the appendix in deciding the motion to dismiss. At one point during the argument, Mr. Innelli, plaintiff's attorney, also consulted one of the documents in the appendix (the "financial statements which were appended to a press release") in arguing that the characterization of the settlement as an extraordinary item had a material impact on "the information that [was] disseminated to the marketplace." (*See id.* at 59, lines 15–25 to 60 lines 1–7).

**4.** Plaintiff, however, argues that I may not use the documents to stand for the truth of the matter asserted. I agree. In first granting summary judgment and now in dismissing plaintiff's claims, the truth or falsity of the statements made in the documents is beside the point. Rather, the documents are consulted for the sole

purpose of putting the alleged misrepresentations in complete context.

**5.**

| Document | Cite in Amended Complaint |
|---|---|
| March 14, 1989 PR | ¶ 49(a) |
| FY90 4Q and Final PR | ¶ 21 |
| FY91 1Q PR and Report | ¶ 22 |
| FY91 2Q PR and Report | ¶ 24 |
| CDTV PR | ¶ 25 |
| FY91 3Q PR and Report | ¶ 26 |
| May 9, 1991 PR | ¶ 49(b) |
| FY91 4Q PR and Report | ¶ 27 |
| 1991 Annual Report | ¶¶ 28–30, 34 |
| FY92 1Q PR and Report | ¶ 31 |
| FY92 2Q PR and Report | ¶ 32 |
| FY92 3Q PR and Report | ¶ 39 |
| FY92 4Q PR and Report | ¶¶ 41–42 |
| 1992 Annual Report | ¶ 58 |
| FASB No. 5 | ¶ 51 |

**6.** Also included in the appendix was a copy of the amended complaint, slip opinions, and Commodore Stock prices as printed in the New York Times. It is obviously appropriate to consult the complaint and slip opinions. I will take judicial notice of the stock prices. Fed.R.Evid. 201(b)(2) & (c).

alter the 'total mix' of the information" available. *See TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2123, 48 L.Ed.2d 757 (1976).

■ Similarly, I found that the accounting treatment of the re-purchase of the Prudential warrants was immaterial because "both transactions were fully disclosed in the company's financial statements and in its press releases. Any reasonable investor knew from reading any of those documents what warrants Commodore had issued, when it bought them back, and at what price.... [N]o reasonable investor could have considered the *accounting treatment* of the purchases significant." Once again, the "total mix" of information available to the investing public was not altered by the accounting treatment of the warrant repurchase.

Although my conclusions were couched in "summary judgment" language, I essentially held that plaintiff failed to state a claim against AA. After properly considering the alleged misrepresentations in the context of a motion to dismiss, I now conclude they were immaterial as a matter of law, and therefore, I must dismiss plaintiff's claims against AA.

### b. The Commodore defendants

■ I granted summary judgment in favor of the Commodore defendants on the claims arising from: 1) the characterization of the litigation settlement; 2) the representations regarding CDTV; and, 3) the false portrayal of growth in a shrinking European market. As with AA, I determined that no reasonable investor would have found the misrepresentations relating to the litigation settlement to be material.

■ I also concluded that Commodore defendants' statements about CDTV, which plaintiff alleged to be materially misleading, did not support a securities fraud case as a matter of law. I held that "[a]ll of Commodore's statements about CDTV either constitute unactionable 'puffing' or they are not misleading."

■ Finally, I found that the alleged misrepresentations and omissions regarding the European market were non-actionable as well. Commodore "reported both a large drop in earnings and a much smaller drop in sales. Anyone with an elementary mathematics education could determine that Commodore's sales price dropped proportionately." I held that "[w]hen the undisclosed elements of a company's financial situation are obvious from that which the company *does* disclose, the company cannot be held liable for a material omission." Because all pertinent information was available to investors to determine that the prices of Commodore's computers was reduced, it cannot serve as a basis for a securities fraud claim.

Each of these determinations, although originally the result of a summary judgment analysis, remains valid when considered in the context of a motion to dismiss. In each instance, plaintiff has failed to state one of the essential elements of his claims, whether it be the materiality element or the actual misrepresentation or omission, as in the CDTV claim. Thus, each of these claims must now be dismissed.[7]

### C. THE EFFECT OF THE *CENTRAL BANK* CASE.

■ During the pendency of this motion for reconsideration, the United States Supreme Court held that no cause of action exists under section 10(b) and rule 10b–5 for aiding and abetting a manipulative or deceptive act in connection with the purchase or sale of securities. *Central Bank of Denver v. First Interstate Bank,* —— U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). Therefore, irrespective of my determination in this motion for reconsideration which reaffirms my conclusions from the summary judgment analysis, plaintiff's claims against any of the defendants for aiding and abetting securities law violations must be dismissed.

The claims plaintiff alleged against the Commodore defendants clearly asserted primary liability and are thus unaffected by *Central Bank.* This result is less clear with

---

7. Plaintiff's claim arising from the alleged obligation to repurchase the Prudential warrants is unaffected by this opinion and shall go forward.

respect to AA. Plaintiff's "Amended Class Action Complaint as to Arthur Andersen & Co." charges that AA violated securities laws due to its roles in: 1) the Prudential warrant transaction, and 2) the characterization of the litigation settlement as an extraordinary item.

Plaintiff's allegations with respect to the Prudential warrant transaction are insufficient to support any claim other than one for aider and abettor liability, which has now been abolished. Plaintiff states that Commodore "consulted Arthur Andersen" and that "AA advised or concurred with Commodore's decision to treat the re-purchases as equity transactions." (Doc. No. 18, ¶ 19.) He also maintains that "Commodore, with AA's guidance and express approval, effectively paid Prudential an additional $9 million in interest without ever recording any expense." (*Id.*) He further states, "AA provided direct and substantial assistance to Commodore in misrepresenting the true nature of the Prudential transactions." (*Id.* at ¶ 23.) Plaintiff has not alleged facts in connection with the Prudential warrant transaction sufficient to support a primary liability claim under section 10(b) or rule 10b–5 against AA. Each and every misrepresentation alleged was made by Commodore. Plaintiff's allegations against AA do not go beyond allegations that AA assisted Commodore in perpetrating securities fraud and are thus not cognizable.

Plaintiff alleges that AA committed securities fraud by issuing an unqualified, or "clean," opinion even though the characterization of the litigation settlement as an extraordinary item allegedly violated "generally accepted accounting principles" (GAAP). (*Id.* at ¶ 26.) Plaintiff claims the "clean opinion" was false and misleading itself and that it "provided substantial assistance to Commodore in its scheme to inflate the market price of the company's stock." (*Id.* at ¶ 27.)

Because plaintiff maintains that AA made false representations itself, in the form of the "clean" opinion, rather than merely assisting Commodore in its scheme to defraud, the claims based on the litigation settlement are not affected by *Central Bank. See Central Bank,* —— U.S. at ——, 114 S.Ct. at 1455 ("Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5, assuming all of the requirements for primary liability under Rule 10b–5 are met.")

### CONCLUSION.

In conclusion, plaintiff's motion for reconsideration will be granted, and my order dated August 26, 1993, will be vacated. Because I find that my consideration of the appendix material was proper in the context of a motion to dismiss, I will instead grant defendants' motions to dismiss to the same extent I entered judgment in their favor. Furthermore, all claims alleging aider and abettor liability must be dismissed due to the Supreme Court's ruling in *Central Bank.*