Frank SEIDMAN, et al., Plaintiffs,

v.

AMERICAN MOBILE SYSTEMS,
INC., et al., Defendants.

Civ. A. No. 92–1782.

United States District Court,
E.D. Pennsylvania.

Sept. 30, 1994.

**356**

David H. Weinstein, Robert S. Kitchenoff, Lindsey B. Slaughter, Kohn, Savett, Klein & Graf, P.C., Philadelphia, PA, for plaintiffs.

David L. Braverman, Rona J. Rosen, Klehr, Harrison, Harvey, Branzburg & Ellers, Michael N. Feder, David L. Braverman, Fellheimer Eichen & Braverman, P.C., Philadelphia, PA, for defendants except Deloitte & Touche.

Walter M. Einhorn, Jr., Geoffrey A. Kahn, Alan J. Davis, Ballard, Spahr, Andrews and Ingersoll, Philadelphia, PA, for Deloitte & Touche.

## MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

This is a consolidated action brought by disappointed investors under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), and Rule 10b–5, as adopted by the Securities and Exchange Commission (the "SEC") pursuant to the Exchange Act. Presently before the Court is plaintiffs' renewed motion for class certification (Docket No. 42). Frank and Kathleen Seidman (the "Seidmans") claim that they suffered economic damages when they purchased 1,000 shares of the common stock of defendant American Mobile Systems, Inc. ("AMS") at $9.00 per share on December 11, 1991.[1] They seek to represent a class containing hundreds, possibly thousands, of investors who acquired AMS's stock during the period from July 1, 1990 through March 24, 1992 (the "class period"). Plaintiffs allege that they were harmed by certain omissions and misrepresentations of material fact contained in AMS's financial statements that were audited by Deloitte & Touche ("Deloitte"), and filed with the SEC or distributed to the public by AMS and its chief executive officer, William J. Young ("Young"). For the reasons that follow, the Court shall grant the motion and certify the proposed class, with the Seidmans acting as class representatives.

## I. BACKGROUND

AMS is a corporation located in Woodland Hills, California that provides mobile telephone and radio dispatch services to businesses. On March 24, 1992, at the close of trading on the National Association of Securities Dealers' Automated Quotation System ("NASDAQ"), AMS's stock closed at a price of $6.00 per share. The next day, March 25, 1992, AMS issued a press release, announcing that it had suspended its president and chief executive officer, William J. Young, and was investigating approximately $4.1 million of unauthorized transfers by Young from AMS's bank accounts to other Young-controlled companies during the period from July 1, 1990 until March 24, 1992. AMS also announced that the unauthorized transfers may have caused it to breach covenants con-

---

1. The parties seem to agree that Kathleen Seidman's purchase of AMS's stock was made through her husband, Frank Seidman. The Court's holding regarding Frank Seidman's ability to serve as the class representative shall therefore apply to Kathleen Seidman as well.

tained in certain of its loan agreements.[2] That same day, there was an unusually large volume of trading in AMS's stock and it closed at $4.625 per share.

Thereafter, AMS's board of directors hired Arthur Andersen & Co. ("Arthur Andersen") to conduct an investigation into the unauthorized transfers. Arthur Andersen's objectives were to determine the nature and dollar amount of the transfers and whether the annual and quarterly financial statements that AMS had filed with the SEC during the class period were materially misstated as a result of the transfers.[3]

On June 15, 1992, AMS filed a Form 8–K amendment to its December 31, 1991 Form 10–Q report. The 8–K contained an entry in the amount of $2,279,000 which was described as "a receivable from Autotel Capital Partnership ("ACP"), an entity controlled by [Young]." The 8–K also stated that the collectibility of the receivable was uncertain at that time.

In its Form 10–K report for the year ended June 30, 1992,[4] AMS disclosed that from July 1, 1990 to March 31, 1991, Young, through a series of more than 400 transactions, transferred in excess of $100 million back and forth between AMS bank accounts and non-AMS bank accounts controlled by Young. According to the 10–K report, the volume and magnitude of the transactions were made possible because the principal bank at which AMS did business allowed Young to overdraft AMS's accounts and the accounts of other Young-controlled companies at the bank almost daily. The bank

assessed a monthly "account analysis" charge which was apparently based on the aggregate overdraft position of all accounts at the bank controlled by Young. A portion of this charge was allocated to AMS's account and reflected as a bank entry on AMS's bank statement.

In March, 1991, the bank closed AMS's accounts and other accounts controlled by Young, and required AMS, Young and the other Young-controlled companies to execute promissory notes representing the overdrafts then existing in their respective accounts. AMS executed a short-term unsecured promissory note in the amount of approximately $1.2 million.

AMS also reported in the June 30, 1992 10–K that from April 1, 1991 until March 31, 1992, Young transferred approximately $5.8 million from AMS's accounts to the accounts of other companies he controlled. Young apparently used this money to pay the promissory notes that his non-AMS companies had executed to AMS's former bank, and to finance his acquisition of partnership interests in a company called Sigma Telecommunications.

After AMS suspended Young from his positions in late March, 1992, its board of directors obtained a promissory note from him in the amount of approximately $4.1 million, representing the final receivable for the unauthorized transfers. AMS also secured liens on substantially all of Young's assets, including his home. Young resigned on April 29, 1992. AMS reported in its June 30, 1992 10–K that it was charging $3.7 million of the

---

**2.** In April 1991, AMS borrowed $12 million from a Finnish bank, Kansallis–Osake–Pankki ("KOP"), in the form of a letter of credit and revolving loan. The letter of credit was scheduled to convert to a five year variable interest rate loan in April of 1993. To secure the loan, KOP took an interest in substantially all of AMS's assets and properties. The KOP loan agreement contained certain cash flow requirements to be maintained by AMS, which, if not fulfilled, would accelerate the loan, thereby causing it to become immediately due and payable.

**3.** Since it is registered under the Securities and Exchange Act of 1934, AMS is subject to the

Act's periodic reporting requirements. These periodic reports include the 10–K annual report, the 10–Q quarterly report, and the 8–K report for certain current specified material changes to the issuer's condition or operations. *See* 15 U.S.C.A. § 78m; Thomas Lee Hazen, 1 *The Law of Securities Regulation* § 9.2 (2d ed.1990).

**4.** The recitation of events concerning the transfer between AMS and non-AMS Young-controlled accounts and other activities in which Young is alleged to have been involved is taken, for the purposes of this motion, from AMS's 10–K. They do not, however, constitute the Court's findings of fact.

$4.3 million Young debt[5] against its income as a reserve for uncollectibility.

On August 13, 1992, AMS discharged Deloitte & Touche, who had filed the company's financial reports during the period when the unauthorized transfers took place. On September 2, 1992, Deloitte sent a letter to the SEC, stating that it had recently been discharged as AMS's independent auditor and, after reviewing AMS's August 20, 1992 Form 8–K, it had informed AMS that certain matters related to the unauthorized transfers constituted reportable events. It also stated that AMS's audit procedures for its 1992 financial statements needed to be expanded to include, among other things, an evaluation of the recoverability of the approximately $4.4 million that AMS alleged to be due from Young and the non-AMS companies that he controlled, and a review of the report anticipated from Arthur Andersen.

On October 8, 1992, Arthur Andersen delivered its report to AMS's board of directors. The report contained the following findings: during the fiscal year ended June 30, 1991, Young caused AMS to transfer $102,152,153 out of AMS's bank accounts to companies controlled by Young while only $101,011,409 was transferred back; the Form 10–Q that AMS filed with the SEC for the quarter ended December 31, 1991, understated the receivables due to AMS from non-AMS Young-controlled companies by $2.2 million and overstated the company's cash position by $2.2 million; the Form 10–Q that AMS filed with the SEC for the quarter ended September 30, 1990, may have understated the receivables due to AMS from non-AMS Young-controlled companies by $675,000 and overstated its cash position by $675,000; AMS's 10–K reports for the fiscal years ended June 30, 1990, and June 30, 1991, and its 10–Q reports for fiscal 1991 and 1992 contained inadequate disclosures relating to the Young banking arrangements; Deloitte was aware of Young's activities, but failed to quantify or analyze them.

## II. PROCEDURAL HISTORY

On March 26, 1992, the Seidmans filed this action against AMS and Young, alleging that the defendants violated Sections 10(b)[6] and 20(a)[7] of the Exchange Act, and SEC Rule 10b–5,[8] by distributing various documents to the public that contained material misrepresentations and omissions regarding AMS's financial condition. Plaintiffs filed their motion for class certification on September 17, 1992. In order to allow the parties to conduct discovery on class certification issues,

---

5. Young also owed AMS approximately $215,000 for goods and services that AMS had provided to him and the other companies he controlled.

6. Section 10(b) of the Securities and Exchange Act of 1934 provides as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

* * * * * *

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. 15 U.S.C.A. § 78j(b).

7. Section 20(a) of the Securities and Exchange Act of 1934 provides as follows:

(a) Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereun-

der shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action. 15 U.S.C.A. § 78t(a).

8. Rule 10b–5 provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.

the Court denied plaintiffs' motion without prejudice to their right to refile it when the discovery was concluded. On March 16, 1993, plaintiffs refiled the motion.

On March 24, 1993, plaintiffs commenced the action against Deloitte, alleging violations of Sections 10(b) and 20(a) of the Exchange Act. On July 26, 1993, the Court ordered the Deloitte action to be consolidated with the action against AMS and Young. Fed. R.Civ.P. 42(a). In order to keep all defendants[9] on the same litigation track, the Court denied plaintiffs' March 16 motion for class certification without prejudice, allowing them to file an amended motion for class certification by August 6, 1993. On August 5, 1993, plaintiffs filed the instant motion for class certification.

## III. *DISCUSSION*

### A. *Standard For Class Certification*

■ Class action treatment of related claims is particularly appropriate where plaintiffs allege violations of the securities laws. In such cases, even though a large number of individuals may have been injured, the damages of individual investors are typically not large enough to provide an incentive to litigate. The effective enforcement of the securities laws therefore depends in large measure on the class action device. Thus, when doubt exists concerning certification of the class, the court should err in favor of allowing the case to proceed as a class action. *Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.), *cert. denied sub nom., Wasserstrom v. Eisenberg,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985).

■ A plaintiff seeking class certification bears the burden of proving that the action satisfies the four threshold requirements of Federal Rule of Civil Procedure 23(a), and that the action qualifies under one of the three subdivisions of Federal Rule of Civil Procedure 23(b). *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 163, 94 S.Ct. 2140, 2145–46, 40 L.Ed.2d 732 (1974). The court is charged with the responsibility of employing a rigorous analysis to ensure compliance with Rule 23. *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372–73, 72 L.Ed.2d 740 (1982). In the present case, plaintiffs contend that they satisfy each of the requirements of Rule 23(a) and of Rule 23(b)(3). The Court will analyze each requirement in turn.

### B. *Rule 23(a) Requirements*

Rule 23(a) provides that:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Defendants do not dispute that plaintiffs meet the requirements of Rule 23(a)(1) (numerosity), and Rule 23(a)(2) (commonality). They do contest, however, plaintiffs' satisfaction of Rule 23(a)(3) (typicality) and Rule 23(a)(4) (adequacy). Given the Court's duty to rigorously ensure compliance with Rule 23, it will examine plaintiffs' allegations relating to all four prongs.

### 1. *Numerosity*

There is no magic minimum number necessary to satisfy the Rule 23(a)(1) numerosity requirement. *See Moskowitz v. Lopp,* 128 F.R.D. 624, 628 (E.D.Pa.1989). In the present case, since the plaintiffs have alleged a class of hundreds, possibly thousands, of investors, the Court finds that the numerosity requirement is satisfied.

### 2. *Commonality*

■ To satisfy the commonality requirement of Rule 23(a)(2), the plaintiffs must demonstrate that there are questions of law or fact common to the class. Plaintiffs' complaint alleges a single, ongoing course of

---

**9.** On August 28, 1992, a default was entered against defendant William J. Young for failure to appear, plead or otherwise defend the action. On March 26, 1993, a default was re-entered against Young on the same grounds.

**360**

fraudulent behavior by which AMS, Young and Deloitte failed to disclose Young's unauthorized transfer of hundreds of millions of dollars from AMS to Young-affiliated companies during the period from July 1, 1990, until March 24, 1992. Allegations of a common course of fraudulent conduct generally satisfy the commonality requirement. *See Gruber v. Price Waterhouse*, 117 F.R.D. 75, 79 (E.D.Pa.1987) (where plaintiffs' alleged that company's financial statements misrepresented the true nature of its financial condition with the result that its stock price was artificially inflated, the Rule 23(a)(2) commonality requirement was satisfied). Moreover, since plaintiffs are proceeding under a fraud-on-the-market theory, individual reliance is not an issue. Rather, all members of the class must prove that the alleged misrepresentations and omissions affected the market and that they suffered damages as a result. Thus, the only questions affecting individual members of the class in this case are damages, and the need for individual damage calculations does not defeat class certification where common questions as to liability predominate. *See Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). The Court therefore finds that the commonality requirement has been satisfied.

### 3. *Typicality*

■ Fed.R.Civ.P. 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). A plaintiff's claim is typical if it arises from the same event or course of conduct that gives rise to the claims of other class members and is based on the same legal theory. The heart of this requirement is that the plaintiff and each member of the represented group have an interest in prevailing on similar legal claims. *Zeffiro v. First Pa. Banking & Trust Co.*, 96 F.R.D. 567, 569–70 (E.D.Pa. 1983). The "threshold for establishing typicality is low," *see In re Atlantic Financial Federal Securities Litigation*, Civ. A. No. 89–645, 1992 WL 50072, at *3 (E.D.Pa. Feb. 28, 1992), and Rule 23(a)(3) will be satisfied as long as the factual or legal position of the

representatives are not markedly different from that of other members of the class. *Weiss v. York Hosp.*, 745 F.2d 786, 809 n. 36 (3d Cir.1984), *cert. denied*, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985). *See also Eisenberg v. Gagnon*, 766 F.2d at 786 ("Typical is not identical, however ... and even atypical elements of a claim may often be adequately treated by judicious severance or use of subclasses or other separate treatment of individual issues.") (citation omitted).

Defendants contend that Mr. Seidman's claims are not typical because he is a "contrarian" investor who does not rely for his investment decisions on the integrity of the market, and who would have bought AMS's stock even if he had known of the unauthorized transfers. Moreover, defendants contend that Mr. Seidman relied on the advice of a business acquaintance in buying AMS's stock, that Mr. Seidman is not credible, and that the timing of Mr. Seidman's purchase makes him vulnerable to a materiality defense. The Court will discuss each of the defendants' contentions in turn.

#### a. *The contrarian argument*

■ Plaintiffs bring this action under the fraud-on-the-market theory. The fraud-on-the-market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 241–47, 108 S.Ct. 978, 988–92, 99 L.Ed.2d 194 (1988); *Hayes v. Gross*, 982 F.2d 104, 107 (3d Cir.1992); *Peil v. Speiser*, 806 F.2d 1154, 1161 (3d Cir.1986). Misleading statements will therefore defraud purchasers of the stock, even if the purchasers do not directly rely on the misstatements. The causal connection between the defendant's fraud and the plaintiff's purchase of the stock in such a case is no less significant than in a case of direct reliance on misrepresentations. *Id.*

Deloitte argues that Mr. Seidman employs a "contrarian" investment philosophy by

which he knowingly buys out-of-favor stocks at a reduced price in anticipation of a turnaround in value. Accordingly, the argument goes, Mr. Seidman cannot be presumed to have relied on the market's evaluation of the stock purchase and his claim is therefore atypical of those of other members of the class.

The Court is not persuaded by Deloitte's argument for two reasons. First, as is evident from the wording of Rule 23(a)(3),[10] the typicality requirement focuses on the class representative's claims or defenses, not on the defendant's defenses against the class representative. *See* 1 *Newberg on Class Actions* § 3.16, at 175–76 (2d ed. 1985). Second, whether or not Mr. Seidman in fact relied on the integrity of the market goes to the merits of the case and is therefore an inappropriate matter for the Court to consider on a motion for class certification. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974) ("We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action."); *Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1985) (abuse of discretion for district court to deny class certification on grounds of individual issues as to reliance).[11]

### b. *Reliance upon the integrity of the market*

■ AMS also argues that Mr. Seidman would have purchased its stock even if he had known of Mr. Young's fraudulent transactions and thus that he did not rely upon the integrity of the market when making his purchase. The result, according to AMS, is that Mr. Seidman's claims are atypical of those of the other members of the class.

AMS presents the argument as a syllogism. The major premise is that Mr. Seidman would have bought the stock even if he had known certain bad news about the company (i.e., that it had performed poorly in the past). The minor premise is that William Young's unauthorized transfers of assets from AMS to Young-affiliated companies was bad news. The conclusion is that Mr. Seidman would therefore have purchased AMS's stock, even if he had known about the unauthorized transactions. The Court finds this bit of deductive reasoning to be flawed. There is a qualitative difference between disclosed information regarding a company's poor, but honest, past performance on the one hand, and undisclosed information about dishonest transfers of the company's assets to other companies on the other. It does not follow, therefore, that simply because Mr. Seidman would have purchased the AMS stock if he had known about the company's poor prior performance, he would also have purchased the stock if he had known about

---

**10.** Rule 23(a)(3) provides that:
> One or more members of the class may sue or be sued as representative parties on behalf of all only if
> * * * * * *
> (3) the claims or defenses *of the representative parties* are typical of the claims or defenses of the class ...

Fed.R.Civ.P. 23(a)(3) (emphasis added).

**11.** This Court has held in numerous cases that defenses going to the merits of a representative plaintiff's claim are not appropriately adjudicated at the class certification stage. *See Moskowitz v. Lopp,* 128 F.R.D. 624, 631 (E.D.Pa.1989) ("the possible availability of a unique defense does not foreclose class certification ... Exactly what plaintiff relied on in purchasing and selling his shares of Hutton stock is a question of fact which can not be resolved at the class action stage.") (citation omitted); *Gavron v. Blinder Robinson & Co., Inc.,* 115 F.R.D. 318, 323–24 (E.D.Pa.1987) ("While it is clear that non-reliance upon the integrity of the market is an affirmative defense to a fraud-on-the-market theory claim ... it is also clear that defendants' claim of non-reliance is insufficient to deny a class action certification.") (citation omitted); *Fickinger v. C.I. Planning Corp.,* 103 F.R.D. 529, 531 (E.D.Pa.1984) ("Defendants' claim of lack of reliance, whether true or not, is insufficient to deny class certification here. Determining the lack of reliance claim requires the court to delve into the merits of the action. Appraisal of a class action, however, does not depend on a showing of a probability of success on the merits, nor is the court authorized to make such an inquiry at this stage of the proceedings."); *Cohen v. Uniroyal, Inc.,* 77 F.R.D. 685, 695 (E.D.Pa.1977) ("[I]f non-reliance is an affirmative defense to a nondisclosure suit under § 10(b), any consideration of that issue by the court on a motion for class certification would be an improper intrusion into the merits of the case.").

the unauthorized transactions.[12]

In any event, AMS's argument is unavailing in that it is based on facts that are disputed. Contradicting AMS's version of the facts, Mr. Seidman has categorically denied that he would have purchased AMS's stock had he known the true state of events at the time of purchase. To that end, Mr. Seidman filed a declaration in this case in which he stated:

> Had disclosure of Mr. Young's massive check kiting scheme or of other facts reflecting an improper management style or lack of personal integrity by management been made by AMS, my wife and I would not have purchased AMS stock.

Seidman Decl. ¶ 4 (docket number 37). Along the same lines, Mr. Seidman repeatedly denied, during his second deposition, that he would have bought AMS's stock if he had known about the fraudulent transactions.[13]

### c. *Reliance upon the advice of others*

■ AMS argues that the Seidmans cannot advance the fraud-on-the-market theory because they relied upon the advice of Bruce Margetich, a business acquaintance, in deciding to purchase the AMS stock. As with Deloitte's contrarian argument, this contention goes to the merits of the case and is therefore inappropriate to consider on a motion for class certification. Moreover, even if it were appropriate to consider this argument at this stage of the litigation, it would fail because the fact that a class representative did not purchase his stock for the same reason as every other member of the class does not make his claim atypical. *See Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 122 F.R.D. 177, 181 (E.D.Pa. 1988).

In *Ettinger*, the defendant argued that the plaintiff representative's claims were atypical of those of the class because she relied on the advice of her husband in purchasing the securities at issue in the case. Judge Ditter rejected this argument, stating:

> The individual circumstances of the decision by plaintiff's husband to purchase and sell her TIGR's, moreover, do not make plaintiff's claims against Merrill Lynch atypical of the class. The existence of factual differences between the plaintiff's claim and those of the class will not render a plaintiff's claim atypical if the claim arises from the same course of conduct that gives rise to the claims of the class members and if it is based on the same legal theory.

*Id.* at 181. *See also In re Greenwich Pharmaceuticals Securities Litigation*, Civ.A. No. 92–3071, 1993 WL 436031, at *2 (E.D.Pa. Oct. 25, 1993) (plaintiff who relied upon information received from a variety of sources, including his broker and his wife, possessed claims typical of those of the class).

Other Courts within the Third Circuit have also rejected the argument advanced here by AMS. In *In re Data Access Systems Securities Litigation*, 103 F.R.D. 130 (D.N.J.1984), the defendants contended that the claims of the named plaintiffs were atypical because they relied upon advice from their stockbrokers, relatives, friends, and upon general market trends, in deciding to purchase the stock. In rejecting the argument, the court stated:

> [D]iffering types of reliance are present in almost every securities class action. There will always be some individuals who read the financial statements directly, others who read secondary analyses such as

---

12. Mr. Seidman's willingness to purchase the AMS stock in the face of the company's poor historical performance does not undercut his argument that he relied on the integrity of the market for two reasons. First, the fraud-on-the-market theory assumes that the market will account for disclosed information regarding a company's prior poor performance and price the stock accordingly. *See Basic Inc. v. Levinson*, 485 U.S. at 243–44, 108 S.Ct. at 989–90. Second, Mr. Seidman specifically stated in his first deposition that he "re[lied] on the concept that the market is much more astute than I am about

that company and that it should be somewhat fairly priced at the time I'm buying it." Seidman Dep. I at 47.

13. For instance, Mr. Seidman answered one question during his second deposition as follows:

A. I was buying—I bought the stock at a number which did not reflect the value of the company. So had I known that $4 million was missing, which hadn't been reflected in the stock price, I wouldn't have bought the stock. Seidman Dep. II at 95.

Moody's or Value Line, and many others who relied on the advice of stockbrokers or friends. If defendants' argument were to prevail that factual differences of this nature were sufficient to defeat class certification, there could never be a class action of securities purchasers. In the present case, moreover, plaintiffs' modes of reliance—on stockbrokers, friends, and published financial information—is not atypical.

103 F.R.D. at 139. The Court therefore finds that the Seidmans' reliance on Mr. Margetich's advice does not render their claims atypical of those of other members of the class.[14]

*d. Mr. Seidman's credibility*

■ AMS and Deloitte also question Mr. Seidman's veracity, contending that this alleged cloud on his credibility precludes him from serving as the class representative. This argument is premised on asserted contradictions between Mr. Seidman's deposition testimony and a declaration that he filed in this action. During his first deposition on January 27, 1993, Mr. Seidman testified as follows:

Q. Now, you claim that when you purchased the stock, you purchased it at an artificially inflated price, isn't that correct?

A. No.

Seidman Dep. I at 83. In its response to plaintiffs' first motion for class certification, defendant AMS used this answer to argue that Mr. Seidman lacked standing to represent the class because the class claimed that the price of the stock was inflated while Seidman claimed that it was not. Mr. Seidman subsequently filed a declaration in this action in which he stated in relevant part:

Had disclosure of Mr. Young's massive check kiting scheme or of other facts reflecting an improper management style or lack of personal integrity by management

been made by AMS, my wife, and I would not have purchased AMS stock.

Seidman Decl. ¶ 4. Defendants now argue that Mr. Seidman's declaration contradicts the answer that he gave during his first deposition. The Court disagrees. When viewed in the context of other testimony that he gave during his first deposition, it is reasonable to conclude that Mr. Seidman's answer, that he did not believe that the stock was artificially inflated when he bought it, indicates that he may have simply misunderstood the question.[15]

■ At his second deposition, Mr. Seidman was again questioned about the stock purchase:

Q. Are you saying that you would have bought the stock at a lower price even though Mr. Young had engaged in improper management and showed a lack of integrity?

A. If the management of the company was rectifying that by getting rid of Mr. Young and clearing up everything, and I had all that access and the stock price had been sufficiently reduced, then I possibly would have bought the stock again. It's a question of at what point with what knowledge.

Seidman Dep. II at 95. Defendants argue that, in giving this answer, Mr. Seidman contradicted the statement that he made in paragraph 4 of his declaration. The Court again disagrees. In his declaration, Mr. Seidman stated that he would not have bought the AMS stock if he had known of Young's wrongdoing, presumably because the stock would have been overvalued. At his second deposition, he stated that he would have bought the AMS stock at a later date if AMS had terminated Young and the price of the stock had been sufficiently reduced. In other words, a reasonable construction of Mr. Seidman's statement is that he would have

---

**14.** The Court also notes that, while Mr. Seidman may have relied upon the advice of Bruce Margetich, there is no indication that Mr. Margetich did not rely on the alleged misrepresentations and inflated market price.

**15.** For instance, at another point in the deposition, Mr. Seidman identified members of the

class as "people such as myself who did not have knowledge that the fraud was going on and its effect on the company until reading about it, at which time the share price was substantially lower than where I had acquired it." Seidman Dep. I at 66–67.

bought AMS's stock after the market had had a chance to adjust the price to account for the disclosure of the unauthorized transactions. The Court therefore concludes that, contrary to defendants' contention, the declaration and the deposition statements are not necessarily in conflict with each other.

e. *The timing of Seidman's purchase*

 In a securities fraud case, a plaintiff must prove that the alleged misrepresentation or omission was material. *Basic Inc. v. Levinson,* 485 U.S. 224, 238, 108 S.Ct. 978, 986–87, 99 L.Ed.2d 194 (1988). Defendant Deloitte argues that the timing of Mr. Seidman's purchase of AMS's stock makes his claim vulnerable to a materiality defense to which the other class members would not be subject. According to Deloitte, this potential pitfall makes Mr. Seidman's claim atypical.

Mr. Seidman purchased his AMS stock on December 11, 1991, before AMS filed its December 31, 1991 Form 10–Q with the SEC on January 30, 1992. Arthur Andersen stated in its October 8, 1992 report to AMS's board of directors that the December 31, 1992 10–Q was the only 10K or 10Q that contained material misrepresentations. Deloitte argues that, unlike the class members who purchased AMS's stock after the December 31, 1991 10–Q was filed and who will be able to rely on these misrepresentations, Mr. Seidman's claim is based on alleged omissions in AMS's previous reports, that these alleged omissions will be difficult to prove, and therefore that the Seidmans would burden the other class members with the difficulty of proving the materiality of the alleged omissions.

Deloitte's materiality argument is a merit-based defense and is therefore improper for the Court to consider on a motion for class certification.[16] At this stage in the litigation, it is not relevant whether Mr. Seidman will ultimately prove his case, or even if he has stated a cause of action. *See Kahan v. Rosenstiel,* 424 F.2d 161, 169 (3d Cir.) ("A suit may be a proper class action, conforming to Rule 23, and still be dismissed for failure to state a cause of action."), *cert. denied,* 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970); *In re Kulicke & Soffa Industries, Inc. Securities Litigation,* No. 86–1656, 1990 WL 1478, at *2 (E.D.Pa. Jan. 9, 1990) ("any discussion about whether certain financial information was material or not goes to the merits of the case and is inappropriate at the class certification stage").

Moreover, the fact that other members of the class bought their AMS stock before or after Mr. Seidman does not make his claim atypical. Plaintiffs allege a protracted series of misrepresentations and omissions by the defendants that began before Mr. Seidman bought his stock on December 11, 1991, and extended after that date. It is to be expected therefore that the hundreds, possibly thousands of investors, who make up the class will have bought their stock on many different dates within the class period. In order to prevail, the plaintiffs will eventually have to prove that the alleged misrepresentations and omissions during the class period were material, but at this stage mere different dates of purchase will not defeat class certification. *See e.g., In re Scott Paper Co. Securities Litigation,* 142 F.R.D. 611, 615 (E.D.Pa.1992) ("A majority of courts have declined to find a conflict between a plaintiff and the class sufficient to deny certification simply because some class members pur-

16. Deloitte bases its argument on *Vosgerichian v. Commodore Intern.,* 832 F.Supp. 909 (E.D.Pa. 1993). In that case, a class of investors charged the defendant company and the accounting firm that prepared its financial statements with securities fraud for characterizing a $9.2 million settlement with the company's former president as an "extraordinary item" in violation of Generally Accepted Accounting Principles. The plaintiffs in *Vosgerichian* argued that the characterization served to inflate the company's apparent earnings for the quarter in question. Judge Ditter granted summary judgment for the defendant accounting firm, finding that the characteriza-

tion was not a material misrepresentation because the financial statements made it clear what the amount, purpose and effect of the settlement were. *Id.* at 914.

*Vosgerichian* is distinguishable for two reasons. First, Judge Ditter was confronted with a motion for summary judgment where it was permissible to inquire into the merits of the plaintiffs' claims. Second, *Vosgerichian* is factually distinguishable because the amount of the transaction, its purpose, and its effect on the defendant company were disclosed, whereas in the present case only the existence of Young's unauthorized transactions were disclosed.

chased after the date of plaintiff's purchase."); *Grossman v. First Pennsylvania Corp.*, Civ.A. No. 89–9234, 1991 WL 222071, at *5 (E.D.Pa. Oct. 23, 1991) (no conflict between representative and class members who sold after him because it is the defendant's course of conduct over time that is at issue).[17]

#### f. *The relevant class period*

Relying on Arthur Andersen's determination that only the December 31, 1992 10–Q contained material misrepresentations, AMS contends that the class period should begin on January 29, 1992, rather than July 1, 1990. The Court rejects this argument.[18] The claims advanced by the class in this case allege a single, ongoing course of fraudulent behavior by which AMS, Young and Deloitte failed to disclose Young's unauthorized transfer of hundreds of millions of dollars from AMS to Young-affiliated companies during the period from July 1, 1990, until March 24, 1992. In the very report that defendants rely upon to constrict the class period, Arthur Andersen "determined that the disclosures [contained in the 10–K reports for the years ended June 30, 1990 and 1991, and the quarterly 10–Q reports for fiscal 1991 and 1992] related to the Bill Young banking arrangements and the volume of cash transactions made were not adequate." Arthur Andersen also found that AMS's September 30, 1990 10–Q may have understated its accounts receivable from affiliates and overstated its cash position by $675,000. The Court therefore finds that the relevant class period should extend from July 1, 1990 until March 24, 1992.[19]

### 4. *Adequacy of Representation*

Fed.R.Civ.P. 23(a)(4) provides that a class action may be maintained only if "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). A determination of the adequacy of the proposed representation of a class involves a two-pronged inquiry: (1) whether plaintiffs' counsel is qualified, experienced, and generally able to conduct the proposed litigation, and (2) whether plaintiffs' interests are antagonistic to those of the class. *Weiss v. York Hosp.*, 745 F.2d 786, 811 (3d Cir.1984), *cert. denied*, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985).

Defendant AMS has challenged the Seidmans' ability to adequately represent the interests of the class, arguing that there is no evidence that they can bear the costs of the

---

17. The Court also notes that Deloitte's materiality argument is premised on the assumption that Arthur Andersen's determination (that the December 31, 1992 10–Q was the only document that contained material misrepresentations) is correct. Plaintiffs dispute Arthur Andersen's determination, alleging that AMS distributed documents before December 31, 1992, that contained material misrepresentations. It will, of course, be for the jury to decide who is correct.

18. AMS also argues that the Seidmans' claims are not typical of those of other members of the class because they purchased their stock on December 11, 1991, outside of the narrowed class period that AMS proposes. Since the Court rejects AMS's argument for narrowing the class period, it also will reject AMS's typicality argument.

19. AMS also argues that the members of the class have not suffered any damages because AMS's stock has actually risen in value since the end of the class period, trading as high as $27.25 per share on November 1, 1993. The Court disagrees. In the Third Circuit, damages in securities fraud cases are measured by the out-of-pocket method which focuses on a defrauded buyer's damages at the date of purchase and allows him to recover the difference between the price he paid for his investment and what it was actually worth at the time of purchase. *See Thomas v. Duralite Co., Inc.*, 524 F.2d 577, 586 (3d Cir.1975); *Sharp v. Coopers & Lybrand*, 83 F.R.D. 343, 347–48 (E.D.Pa.1979). The Seidmans allege that AMS's stock was worth less than the $9 per share that they paid for it on December 11, 1991. This is sufficient for the purposes of a class certification motion. The Court also notes that AMS's argument is undercut by the volatility of AMS's stock price since the end of the class period. While it traded as high as $27.25 per share on November 1, 1993, it also traded as low as $2.25 per share on November 27, 1992. Therefore, according to AMS's post-class period measure of damages theory, the Seidmans could argue that they had lost almost $7 per share.

As to AMS's argument that its stock was actually undervalued, the Court finds that this is a question for the jury. "If the plaintiffs cannot prove their out-of-pocket losses, they will of course not recover. But we believe that they are entitled to proceed according to their claims as to how much they have suffered." *Sharp v. Coopers & Lybrand*, 83 F.R.D. at 348 n. 9.

litigation. The Court rejects this argument. Mr. Seidman testified at his first deposition that his counsel, a well-recognized Philadelphia law firm experienced in securities litigation, would be advancing the costs and expenses of the litigation pursuant to a contingent fee arrangement. *See* Seidman Dep. I at 23. This type of arrangement is permitted by Rule 1.8(e)(1) of the Pennsylvania Rules of Professional Conduct, and has been recognized by the Third Circuit, *see Vanderbilt v. GEO—Energy Ltd.*, 725 F.2d 204, 210 (3d Cir.1983) ("It is not uncommon in class actions to have persons other than the named plaintiff pay the costs of the litigation."). Additionally, there is no evidence that the Seidmans' interests are anything but congruent with the interests of the putative class. Therefore, the Court finds that the Seidmans have satisfied the adequacy of representation requirement.

### C. *Rule 23(b)(3) Requirements*

Rule 23(b)(3) provides in pertinent part that:

> (b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
>
> \* \* \* \* \* \*
>
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair adjudication of the controversy.

Fed.R.Civ.P. 23(b)(3). Rule 23(b)(3) therefore mandates that the plaintiffs satisfy the requirements of predominance and superiority.

### 1. *Predominance*

■ To satisfy the predominance requirement, plaintiffs must demonstrate that the questions of law or fact that are common to the class predominate over individual issues. As set forth above in connection with the discussion of the commonality requirement of Rule 23(b)(2), plaintiffs' complaint alleges a single, ongoing course of fraudulent behavior by which AMS, Young and Deloitte failed to disclose Young's unauthorized transfer of hundreds of millions of dollars from AMS to Young-affiliated companies during the period from July 1, 1990, until March 24, 1992. Since plaintiffs are proceeding under a fraud-on-the-market theory, individual reliance is not an issue. Rather, all members of the class must prove that the alleged misrepresentations and omissions affected the market and that they suffered damages as a result. Thus, the only questions affecting individual members of the class in this case are damages. The need for individual damages calculations, however, does not diminish the appropriateness of class action certification where common questions as to liability predominate. *See Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *Wolgin v. Magic Marker Corp.*, 82 F.R.D. 168, 176 (E.D.Pa.1979). The Court therefore finds that plaintiffs have satisfied the Rule 23(b)(3) predominance requirement.

### 2. *Superiority*

■ To satisfy the superiority requirement, plaintiffs must demonstrate that a class action is superior to other methods of adjudicating the controversy. Plaintiffs allege that hundreds, possibly thousands, of investors have been harmed by the defendants' actions. A class action would consolidate all of their potential lawsuits into one action, and thus promote the just, speedy, and inexpensive determination of this action. *See* Fed.R.Civ.P. 1. Furthermore, as noted *supra*, a class action is generally recognized to be superior to individual lawsuits in securities class actions. *See Eisenberg v. Gagnon*, 766 F.2d at 785. The Court therefore finds that the plaintiffs have satisfied the superiority requirement.

### IV. *CONCLUSION*

The Court finds that plaintiffs satisfy all of the requirements under Rule 23(a) as well as 23(b)(3). Therefore, the Court shall grant plaintiffs' motion for class certification. The plaintiff class shall consist of all persons who purchased AMS's common stock during the period from July 1, 1990, until March 24, 1992, and who sustained damages as a result

of such purchase.[20] The Court shall also certify the Seidmans as representatives of the plaintiff class and appoint David H. Weinstein and Scott H. Mustin as attorneys for the class.

An appropriate order shall be entered.

### ORDER

AND NOW, this 30th day of September, 1994, upon consideration of Plaintiffs' Renewed Motion for Class Certification (docket no. 42), defendants' responses (docket nos. 57 and 58), and plaintiffs' reply (docket no. 60), it is hereby **ORDERED** that the motion is **GRANTED** upon the following terms:

1. The plaintiff class is certified and shall consist of all persons who purchased or acquired the common stock of defendant American Mobile Systems, Inc. during the period from July 1, 1990, until March 24, 1992, and who sustained damages as a result of such purchases. American Mobile Systems, Inc., Deloitte & Touche, all Deloitte & Touche partners, all present and former officers and directors of American Mobile Systems, Inc., all members of the immediate families of the foregoing individuals, and any entity affiliated with or controlled by the foregoing individuals or the defendants shall be excluded from the class;

2. Plaintiffs Frank and Kathleen Seidman are certified as representatives of the plaintiff class;

3. David H. Weinstein, Esquire, Kohn, Nast & Graf, P.C., and Scott H. Mustin, Esquire are appointed as attorneys for the class.

AND IT IS SO ORDERED.

---

**20.** All partners in defendant Deloitte & Touche, all present and former directors of defendant AMS, all members of the immediate families of the foregoing individuals, and any entity affiliated with the foregoing individuals or the defendants shall be excluded from the class.